UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHNNY W. PHARES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:15-cv-2056-TWP-MJD |
| | ) |
| NANCY A. BERRYHILL[1], Acting Commissioner of the Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Johnny W. Phares ("Phares") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), denying his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423(d) ("the Act"). For the following reasons, the Court **reverses in part** the final decision of the Commissioner and **remands** this action for further proceedings.

**I. BACKGROUND**

**A.  Procedural History**

On January 9, 2013, Phares filed an application for DIB, alleging a disability onset date of June 30, 2010, due to hypertension, insomnia, depression, and a panic disorder with agoraphobia. His claim was initially denied on February 18, 2013, and upon reconsideration on March 28, 2013. Phares filed a written request for a hearing on May 9, 2013. On July 10, 2014, a hearing was held via telephone conference before Administrative Law Judge Daniel J. Mages ("the ALJ"). Phares

---

[1] Nancy A. Berryhill is now the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25 (d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for former Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

was present and represented by Andrew S. Youngman, a non-attorney, as well as by counsel. A vocational expert, Ray O. Burger ("the VE"), appeared and testified at the hearing. On August 8, 2014, the ALJ denied Phares' application for DIB. Following this decision, Phares requested review by the Appeals Council on September 2, 2014. On November 5, 2015, the Appeals Council denied Phares' request for review, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. On December 28, 2015, Phares filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (Filing No. 1.)

**B. Factual Background**

At the time of his alleged disability onset date, Phares was forty-seven years old, and he was fifty-one years old at the time of the ALJ's decision. He is a high school graduate. Prior to the onset of his alleged disability, Phares worked as a self-employed carpet installer. On January 30, 2010, he stopped working after suffering a panic attack and he has not worked since that date.

In June 2010, an emergency room physician diagnosed Phares with anxiety, and discharged him with a prescription for Xanax. (Filing No. 8-8 at 5-6.) One month later, on July 13, 2010, Phares had a followed-up visit with Lonna Weaver, APN[2] and reported that Xanax worked well and prevented panic attacks, however, once he completed the prescription he experienced another panic attack. *Id.* at 77. Nurse Weaver prescribed Zoloft, Xanax, and Ambien, which Phares later reported helped ease his anxiety and panic disorder. *Id.* at 75, 78. On October 12, 2010, Nurse Weaver changed Phares' Zoloft prescription after he complained of certain side effects. *Id.* at 73. The following month, Phares reported to Nurse Weaver that he suffered approximately four to five panic attacks. Thereafter, Nurse Weaver adjusted Phares' medication and referred him to a psychiatrist. *Id.* at 71-72.

---

[2] Advanced Practice Nurse

On February 21, 2011, Nurse Weaver increased Phares' Xanax dosage after he complained that the medication did not control his anxiety as well as before. *Id*. at 66-67. Nurse Weaver again increased Phares' Xanax dosage on May 10, 2011, because Phares reported suffering several panic attacks. *Id.* at 65. Ten days later, Phares reported suffering insomnia, as well as panic attacks at bedtime, but stated that he felt better than he had felt in a long time. *Id.* at 62. Nurse Weaver observed that Phares appeared less anxious than he had in the past. *Id.*

On January 20, 2012, Phares visited his primary care provider, Stina Wedlock, M.D., regarding his anxiety and panic disorder. *Id.* at 58. Phares reported "functioning as somewhat difficult," and complained of anxious thoughts, difficulty sleeping, excessive worry, racing thoughts, and restlessness. *Id.* Phares stated that conflict and stress aggravated his anxiety. *Id*. Dr. Wedlock opined that Phares had a good response to medication, and prescribed Xanax and Amitriptyline. *Id*.

On April 23, 2012, Phares visited Dr. Wedlock and again reported his functioning as somewhat difficult, as well as anxious thoughts, difficulty falling asleep, excessive worry, and shaking. *Id*. at 54, 56. Dr. Wedlock noted that Phares demonstrated the appropriate mood and affect, and continued Phares' Xanax prescription. *Id*. at 57. On July 26, 2012, Dr. Wedlock opined that Phares' panic disorder was stable and Phares handle medication well. *Id*. at 51. Dr. Wedlock refilled Phares' medications without change. *Id*. at 53. On October 18, 2012, Dr. Wedlock again noted that Phares remained stable. *Id*. at 48. On January 11, 2013, Dr. Wedlock indicated that Phares' panic attacks were under "fair control," Phares demonstrated the appropriate mood and affect, and continued Phares' Xanax prescription without change. *Id*. at 45-47.

On February 12, 2013, at the request of the state agency, Robert Kurzhals, Ph.D., evaluated Phares and reported that Phares goes out on his own once a month to purchase groceries, serves as

his father's power of attorney, and manages his father's finances. *Id*. at 90. Phares also informed Dr. Kurzhals that he has anxiety about driving, but he maintains a driver's license and drives himself to appointments. *Id*. at 90-91. Dr. Kurzhals suggested a diagnosis of panic disorder with agoraphobia and personality disorder NOS with dependent traits. *Id*. at 93.

On April 16, 2013, Phares returned to Dr. Wedlock and reported that he was doing well. (Filing No. 8-9 at 46.) Dr. Wedlock noted that Phares' condition was stable, and continued his medication without change. *Id*. at 46-48. On July 16, 2013, Dr. Wedlock opined that Phares' panic attacks were stable, and again continued his medication without change. *Id*. at 45. On October 17, 2013, Dr. Wedlock again reported that Phares' panic attacks were stable, and noted that Phares had no associated symptoms. *Id*. at 37.

On January 17, 2014, Phares visited Dr. Wedlock and reported that driving and being around people made his panic attacks worse. *Id*. at 36. Dr. Wedlock refilled Phares' medication and recommended that he return in three to four months. *Id*. When Phares returned on April 18, 2014, he reported that his Xanax and Amitriptyline prescriptions continued to work well. *Id*. at 31. Dr. Wedlock noted that Phares' anxiety was stable. *Id*. at 32.

Phares' hearing before the ALJ was held on July 10, 2014. Phares testified that he requested a telephonic hearing because his severe panic attacks prevented him from driving, and appearing in person. (Filing No. 8-2 at 37.) He testified that he grocery shops once a month, but did not go more frequently because he was afraid of driving to the store and had difficulty being around people. *Id.* at 38. He also testified that he had difficulty with memory and concentration because he sometimes forgot to buy things at the grocery store and had trouble following the story lines of television programs. *Id*. at 43. Phares further testified that Xanax controlled his anxiety and kept him from getting the shakes. *Id*. at 41. He stated that he had a minor panic attack "every

4

now and then" when he failed to take his anxiety medication on time, but noted that his anxiety and panic attacks were fairly well controlled around the house and while he is on his medication, and worsens when he leaves his home. *Id*. at 41-42.

The VE testified that his opinions would be consistent with the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations, or he would identify any discrepancies between his testimony and those publications. *Id*. at 47. The VE testified that Phares' past work as a carpet installer amounted to heavy work under DOT. *Id*. The ALJ presented to the VE a hypothetical individual of the same age, education, and work experience as Phares who could perform a full range of light work: limited to simple, routine, tasks with the ability to attend, concentrate, and persist for two hours at a time and have no more than brief and superficial interaction with the public, coworkers, or supervisors, as well as no work in crowds. *Id.* at 47-48. The VE responded that the hypothetical person could not perform Phares' past work, but other jobs in the state and national economy existed that such person could perform. *Id.* at 48. Those jobs included housekeeping cleaner, stocker, and mail clerk. *Id*. The ALJ then tweaked the original hypothetical and asked whether there were any other jobs in the state or national economy that the hypothetical person could perform if the individual were further limited to no interaction with the public. *Id*. The VE testified that those jobs as a housekeeper, stocker and mail clerk would still exist. *Id*. The ALJ further adjusted his hypothetical and asked whether any jobs were available if the hypothetical individual would be off task at least ten percent of the workday on a regular and continued basis due to panic attacks, anxiety, and other symptoms of his mental disorders. *Id*. The VE testified that there would be no work whatsoever for such individual. *Id*. at 48-49.

Thereafter, Phares asked the VE about the sources of his numbers, to which the VE replied "United States Publishing" and testified that the numbers came from the fourth quarter of 2013. *Id.* at 49. The VE also testified that he studied the housekeeper, stocker and mail clerk positions, but it has been a while since he conducted labor market surveys regarding those positions. *Id*. Phares objected to the source, positions and numbers offered by the VE and the ALJ agreed to keep the record open for ten days in order to allow Phares time to submit a follow up brief rebutting the VE's testimony. *Id.* at 50-51.

On July 16, 2014, six days after the hearing, Phares filed written objections to the sufficiency of the VE's testimony. Phares first noted that inconsistencies exist between the VE's testimony and the DOT. Phares asserts the DOT describes "Housekeeping Cleaner" as "renders personal assistance to patrons," and lists "Stocker" as heavy work, rather than light work. ([Filing No. 8-7 at 3](#).) Phares also notes that based on current job information, specifically O*NET, "housekeeping cleaner" and "mail clerk" are semi-skilled to skilled positions, rather than unskilled positions. *Id.* at 5. Phares further argues that the Social Security Administration ("SSA") does not recognize U.S. Publishing as a reliable source for determining job information and objected to the VE's reliance on the DOT, rather than O*NET, because the DOT has not been updated since 1991. *Id*. at 3-4.

## II. DISABILITY AND STANDARD OF REVIEW

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any

other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled, despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities) that meets the durational requirement, he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

In order to determine steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). RFC is the "maximum that a claimant can still do despite [his] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in relevant economy, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 416.920(a)(4)(v). The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effects of all impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 424(d)(2)(B). The burden of proof is on the claimant

for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the Court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. THE ALJ'S DECISION

The ALJ first determined that Phares met the insured status requirements of the Act through September 30, 2014. He then began the five step analysis. At step one, the ALJ found that Phares

8

had not engaged in substantial gainful activity since June 30, 2010, the alleged onset date. At step two, the ALJ found that Phares had the following severe impairments: hypertension, insomnia, depression, and a panic disorder with agoraphobia. At step three, the ALJ concluded that Phares does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ then determined that Phares had an RFC to perform a full range of light work with the following limitations: "simple routine tasks with the ability to attend, concentrate and persist for two hours at a time; no more than brief and superficial interaction with the public, coworkers or supervisors; and no work in crowds." ([Filing No. 8-2 at 22](Filing No. 8-2 at 22).) At step four, the ALJ determined that Phares was unable to perform any of his past relevant work. The ALJ went on to determine at step five that Phares was not disabled because there were jobs that existed in significant numbers in the national economy that Phares could perform, considering his age, education, work experience, and RFC. Those jobs included housekeeping cleaner and mail room clerk. Therefore, the ALJ denied Phares' application for DIB because he was not disabled.

## IV. DISCUSSION

In his request for judicial review, Phares asserts two reasons for remand. First, he argues the ALJ failed to meet his step five burden because the ALJ did not address Phares' objections to the VE's testimony. He next argues that the ALJ's RFC conclusion fails to describe and account for Phares' deficiencies in concentration, persistence, and pace. The Court will address each issue in turn.

### A. Step Five Burden of Proof

Phares argues that the Court should reverse and remand the ALJ's decision because the ALJ failed to address all of Phares' objections regarding the VE's testimony and, as such, the ALJ

did not meet his burden under step five. "The ALJ must (on the record) … [r]ule on any objection(s). The ALJ may address the objection(s) on the record during the hearing, in narrative form as a separate exhibit, or in the body of his or her decision." HALLEX § I-2-6-74; *see* SSR 13-2p (requiring "adjudicators at all levels of administrative review to follow agency policy, as set out in … the Hearings, Appeals and Litigation Law manual (HALLEX)").

Phares asserts the ALJ failed to address his objection that the VE's testimony is based solely on a resource that the SSA no longer recognizes as a reliable source. *See* 20 C.F.R. § 404.1566 (the SSA takes administrative notice of reliable job information available from various governmental and other publications, including DOT, County Business Patterns, Census Reports, Occupational Analyses, and Occupational Outlook Handbook). Phares contends that U.S. Publishing is not listed as an administratively noticed source, and further relies on *Herrmann* when arguing that job numbers produced by U.S. Publishing are unreliable because it uses an inherently unreliable statistical method. *See Herrmann v. Colvin*, 772 F.3d 1110, 1112 (7th Cir. 2014) (stating VEs create arbitrary estimates when utilizing U.S. Publishing because U.S. Publishing obtains statistics from census data, but the Census Bureau does not report the number of jobs in each broad job category).

Phares also argues that his written objections specifically noted that the housekeeper and mail clerk positions cited by the VE are identified as semiskilled to skilled jobs on O*NET, an up-to-date information source provided by the Department of Labor, however, the RFC makes clear that Phares could perform only light, unskilled work ("the *DOT,* not only is that an obsolete catalog of jobs (most of the entries in it date back to 1977) but it contains no statistics regarding the number of jobs in a given job category that exist in the local, state, or national economy"). *Herrmann*, 772 F.3d at 1112. Phares asserts the ALJ failed to address this objection and failed to obtain a

reasonable explanation for the inconsistency. Under SSR 00–4p, an ALJ has an "affirmative responsibility" to ask whether a VE's testimony "conflicts with information provided in the DOT" before relying on the VE's evidence to support a determination that a person lacks a disability. *Overman v. Astrue,* 546 F.3d 456, 462–63 (7th Cir. 2008) (quoting SSR 00-4p at 4). If evidence from a VE "appears to conflict with the DOT," SSR 00–4p requires further inquiry, specifically, an ALJ must obtain "a reasonable explanation for the apparent conflict." *Id*. at 463 (quoting SSR 00–4p at 5).

In response, the Commissioner contends that Phares' reliance on *Herrmann* is misplaced because *Herrmann* does not stand for the proposition that a VE may never rely on U.S. Publishing sources. *Herrmann*, 772 F.3d at 1112 (recognizing vocational experts normally rely on U.S. Publishing publications). The Commissioner also relies on *Donahue* when asserting that Phares' objections are late because the hearing was the proper time to object to U.S. Publishing's statistical methods and the VE's inconsistencies with DOT. *See Donahue v. Barnhart*, 279 F.3d 441, 447 (7th Cir. 2002) ("Raising a discrepancy only after the hearing… is too late. An ALJ is not obliged to reopen the record. On the record as it stands—that is, with no questions asked that reveal any shortcomings in the vocational expert's data or reasoning—the ALJ was entitled to reach the conclusion she did"). The Commissioner contends, even despite Phares' late objections, the ALJ acknowledged that there was indeed a conflict between the DOT and the VE's testimony regarding the stocker position, but found no discrepancy between the DOT and the VE's testimony as it relates to the remaining positions.

The Commissioner also explains that the ALJ addressed Phares' argument regarding the housekeeper position and points to the ALJ's statement that Phares' objection was based on the assertion that the housekeeping job "requires that he render personal assistance to patrons." (Filing

No. 8-2 at 26.) The ALJ, however, noted that the RFC limits only superficial interaction, but does not state that Phares cannot tolerate any interaction. The Commissioner argues that, as such, there is no discrepancy between the DOT and the VE's testimony because the DOT does not indicate that "personal assistance" requires more than brief or superficial contact.

The Court first notes that the Commissioner's reliance on *Donahue* is misplaced. Phares requested ten days to file written objections to the VE's testimony. Here, the ALJ, not only permitted Phares' request but, agreed to leave the record open for ten days. *See Donahue*, 279 F.3d at 447 ("[a]n ALJ is not obliged to *reopen* the record") (emphasis added). Ultimately however, the Commissioner's position is well taken. The Court finds that the ALJ's decision adequately addressed Phares' objection that U.S. Publishing is not reliable. The ALJ specifically stated that "[Phares] questioned whether [the VE] based his opinion upon 'reliable' information" and the ALJ found "no evidence that the [VE] relied upon any information that those in his profession do not regularly rely upon in rendering vocational opinions" (Filing No. 8-2 at 26); *see Herrmann*, 772 F.3d at 1112 (recognizing VEs normally rely on U.S. Publishing). Accordingly, because the ALJ addressed this objection, remand is not warranted on this issue.

The Court, however, is persuaded by Phares' second objection that the VE's testimony is inconsistent with up-to-date information provided by the Department of Labor; and the ALJ never responded to this written objection. Phares specifically objected to the housekeeper and mail clerk positions because they are currently classified as semi-skilled to skilled positions, but the RFC states that Phares is capable of performing only light work. (Filing No. 8-7 at 5.) Neither the Commissioner, nor the ALJ, addressed this objection. Accordingly, because the ALJ has an obligation to address all objections, remand is warranted on this issue. *See* HALLEX § I-2-6-74 ("[t]he ALJ must (on the record) … [r]ule on any objection(s)"); *see* SSR 13-2p (requiring

12

"adjudicators at all levels of administrative review to follow agency policy, as set out in… HALLEX").

B. **RFC Incorporation of Phares' Mental Impairments**

The ALJ found that Phares could "concentrate and persist for two hours at a time," however, Phares argues that the RFC does not account for his moderate deficiencies in this area. "[RFC] is the most you can still do despite your limitations." 20 C.F.R. § 404.1545. "In determining the impact of a mental disorder on an individual's capacities, inability to perform substantial gainful activity (SGA) must be demonstrated through a detailed assessment of the individual's capacity to perform and sustain mental activities which are critical to work performance." SSR 85-16. "All limits on work-related activities resulting from the mental impairment must be described in the mental RFC assessment." *Id*. Phares contends that the Court should reverse and remand the ALJ's decision because the ALJ gave a generic finding that Phares could perform simple, routine, repetitive tasks, but failed to describe all limits on work-related activities resulting from Phares' deficiencies. "[L]imiting a hypothetical to simple, repetitive work does not necessarily address deficiencies of concentration, persistence and pace" *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) (finding "for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do").

In response, the Commissioner asserts that the ALJ did not err in determining Phares' RFC, and contends that the ALJ discussed all evidence regarding Phares' mental functioning. The Commissioner notes that Phares points to no evidence that would require the ALJ to find a more restrictive RFC, nor does Phares explain what limitations the ALJ omitted from the RFC finding.

The Commission contends that the RFC determination relied on Phares' own testimony about his mental functioning, Phares' testimony about acting as his father's power of attorney and managing his father's finances, medical records indicating that Phares' anxiety improved, as well as Dr. Kurzhals' and state agency psychologists' conclusions that Phares could follow and understand simple instructions, among other evidence in the record. (Filing No. 8-2 at 24.) The Commission explains that the ALJ then provided a detailed explanation of how he translated the record evidence and testimony into the RFC finding. *See id*. The Commissioner argues that the ALJ's explanation far exceeded his obligation to minimally articulate his reasoning. *See Scheck* 357 F.3d at 700 (the ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability).

The Commissioner lastly asserts that Phares' reliance on *O-Connor-Spinner* is misplaced because the ALJ not only limited Phares to simple routine tasks, but also included specific limitations to address Phares' problems interacting with others, as well as Phares' anxiety regarding crowds and exposure to people. *See Coleman v. Colvin*, No. 13-CV-216-BBC, 2014 WL 910334, at *5 (W.D. Wis. Mar. 10, 2014) (stating "the lesson from *O'Connor–Spinner* is not that the administrative law judge must use a particular term when setting forth the plaintiff's residual functional capacity, but rather that the language he uses must reflect all of the limitations that the plaintiff has"); *see also Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013) (holding an ALJ's discussion sufficiently addressed limitations that were supported by substantial evidence from the record); SSR 96-8p (RFC is based on all of the relevant evidence in the case record). The Commissioner argues that the RFC finding is reasonable and should be affirmed because the ALJ identified and accommodated each work-related limitation that was supported by the evidence.

After reviewing the ALJ's decision and the record evidence, the Court determines that the record supports the ALJ's conclusion that Phares has the mental capacity to "concentrate and persist for two hours at a time." Phares testified that he sometimes have difficulties concentrating and remembering, but the opinions of Dr. Kurzhals, as well as those of the state agency psychologists, show that Phares maintains the capacity to understand, remember, and follow simple instructions. Additionally, the ALJ relied on Phares' own testimony that he acted as his father's power of attorney and managed his father's finances when determining Phares' mental RFC. The ALJ also addressed Phares' anxiety limitations by limiting Phares' contact and interaction with people and crowds. The Court finds that the ALJ explained at length his consideration of the entire record and how he translated all evidence regarding Phares' limitations into the RFC finding. (Filing No. 8-2 at 24.) The Court further notes that Phares has not presented evidence specifically explaining any other limitations supported by the record that the ALJ failed to include or discuss when determining the RFC finding. Accordingly, remand is not warranted on this issue.

## V. CONCLUSION

For the reasons set forth above, the Court finds that the ALJ adequately addressed Phares' objection that U.S. Publishing is not reliable, and the ALJ discussed all of Phares' mental limitations when finding that Phares could "concentrate and persist for two hours at a time." The Court, however, **REMANDS** the ALJ's decision for the sole purpose of addressing Phares' objection regarding inconsistencies between the VE's testimony and the DOT.

SO ORDERED.

Date: 3/27/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

15

DISTRIBUTION:

Karl E. Osterhout
OSTERHOUT DISABILITY LAW, LLC
karl@mydisabilityattorney.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov